## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| COW-MIL FARMS, INC., Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> MONSANTO COMPANY, <br><br> Defendant. | Case No. 17-2386 <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

1.    This case is brought as a class action on behalf of farmers across the country whose crops have been wiped out due to Defendant Monsanto Company's choice of corporate profit over farmers' livelihood, the environment, or anything else. This case focuses on Monsanto's marketing of its genetically modified Xtend seeds without a corollary EPA-approved herbicide (together known as a "system"). Such a decision, to offer a GMO seed without an EPA approved herbicide, flies in the face of standard agro-chemical corporate practice. The incomplete system, a dangerously defective product, was sold to unsuspecting farmers causing widespread damage to Class members' property and crops throughout the United States.

2.    Instead of waiting to market its Xtend seeds until a safe herbicide was available to farmers, Monsanto pushed ahead, and made millions of dollars telling unsuspecting farmers that a "safe" and "lower volatility" dicamba herbicide was forthcoming. Without this herbicide, the foreseeable and realized outcome was not so

profitable for many farmers. Those that purchased the incomplete and defective system predictably applied a volatile dicamba ("old dicamba"), the only herbicide that would protect their new seeds, damaging or wiping out entire swaths of vegetation (*i.e.*, Class members' crops) that were not the intended target of the herbicide due to drift. Monsanto actively promoted the illicit use of the highly volatile and potent herbicide with knowledge that crops without its new genetic traits would be damaged due to volatilization and drift.

3.    Not until the 2017 growing season was dicamba herbicide ("new dicamba") approved for over-the-top agricultural use, and the supposedly lower volatility formula has continued to wreak havoc on agricultural land across the United States.  Anticipated destruction to crops caused by Monsanto to date currently exceeds 3.1 million acres of soybean crops alone, a number which is expected to rise, with nearly half the country (21 states) receiving complaints concerning dicamba drift. The farmers in this Class now ask that Monsanto be held accountable for its conduct that harmed them personally, contaminated the environment, and enriched the company at the expense of farmers throughout the United States.

## NATURE OF THE CASE

4.    Plaintiff brings this class action lawsuit on behalf of a nationwide class of farmers and landowners to recover for damages sustained  as a result of Defendant Monsanto Co.'s ("Monsanto" or "Defendant") premature commercialization of its genetically modified cotton and soybean Xtend seed system without the corollary herbicide, which directly caused lasting and wide-ranging damage to the agricultural and

environmental landscape across the United States, including Class member's crops, due to drift, as described further within.

5.      While Plaintiff and the putative Class grow a variety of crops throughout the United States, they have all been injured by Defendant's premature commercialization of its defective cotton and soybean Xtend seed system and its purchasers' inevitable and foreseeable use of the alternative herbicide, dicamba, a drift-prone herbicide that has wiped out crops on hundreds of thousands of acres of farmland in the United States belonging to Class members.

6.      The cause of the harm to the farmers is Monsanto's willful, reckless, and negligent release of its genetically modified ("GM") Round Up Ready Xtend Crop System ("Xtend Crop System"), which includes Defendant's Roundup Ready 2 Xtend soybeans or Bollgard II Xtend cotton seeds (collectively "Xtend seeds" or "Xtend crops"), without an accompanying EPA-approved dicamba herbicide ("Xtendimax with VaporGrip" hereinafter referred to as "VaporGrip") (*see* Fig. 1).[1] The defective product at issue is Xtend Crop System.



**Fig. 1** "Roundup Ready Xtend Crop System" graphic.

---

[1] Fraley, R. (Monsanto Chief Technology Office), "2016 Citi Basic Materials Conference," (PowerPoint) (Nov. 20, 2016), *available at*: https://monsanto.com/app/uploads/2017/05/2016.11.30_mon_citi_fraley.pdf (last visited Sept. 5, 2017).

7.      Among other things, genetically modified seeds are designed to carry traits that cause them to withstand various herbicides, so farmers can apply the herbicide to combat invasive weeds without harming the GM crops.

8.      Specifically, Xtend seeds are genetically modified to resist the herbicides dicamba and glyphosate, the latter being the main ingredient in Defendant's herbicide, *Roundup*. The modification allows farmers to plant Xtend seeds and apply dicamba and/or glyphosate without damaging the Xtend crops.

9.      However, due to the pervasive use of glyphosate in herbicides over the last several decades, many weed species have developed a tolerance to *Roundup*, diminishing its efficacy and leaving dicamba as the only truly effective defense for Xtend crops (*see* Fig. 2).[2]

---

[2] "Where Weedkiller Won't Work," N.Y. TIMES (May 3, 2013), *available at:* http://www.nytimes.com/interactive/2010/05/03/business/weeds-graphic.html?ref=energy-environment (last visited Sept. 5, 2017).



**Fig. 2 "Where Weedkiller Won't Work"** a depiction of Roundup/glyphosate resistant weeds.

10.    Despite this common knowledge of increased prevalence glyphosate-resistant weeds, Defendant began selling its Xtend seeds without providing farmers a corollary herbicide. Defendants knew glyphosate was ineffective and the dicamba on the market could be deadly to any non-Xtend seed crops in the vicinity of where dicamba might be sprayed due to drift.

11.    Specifically, Defendant marketed and sold Xtend seeds before the EPA had approved the partner herbicide for use in the United States, assuring the public that approval was not necessary for the system, and was otherwise "imminent."

12.     In fact, at all times relevant to this Complaint, there was not a single dicamba-based product registered for in-crop use with Defendant's Xtend seeds, making the application of dicamba illegal under state and federal law.  The only permissible agricultural application for dicamba at the time was for use prior to planting and post-harvest because the available dicamba products on the market ("old dicamba") were highly volatile making them prone to drift to non-target crops and damage them.

13.     Prior to soybean application, old dicamba was commonly mixed with other herbicides and used in pre-planting of corn and wheat crops to control for winter weeds, when vulnerable crop species like soybeans could not be damaged by dicamba, and temperatures remained low enough to minimize the potential for volatilization.

14.     To be effective as an herbicide on soybean crops, a new use for dicamba promoted by Monsanto, dicamba is to be applied generally in higher concentrations, in multiple applications throughout the growing season, and later in the season when higher temperatures significantly increase the propensity for volatilization and drift.[3] The EPA approval essentially expanded the timing of dicamba application.

15.     When dicamba volatilizes and drifts during application onto surrounding crops and vegetation that have not been genetically modified to resist it, dicamba damages the surrounding non-GM crops, such as those belonging to Class members. Even the slightest trace of dicamba can destroy non-dicamba-tolerant vegetation, and drift and/or volatilization can occur for days after application and extend for miles from

---

[3] *See*, Hartzler, B., "Thoughts on the Dicamba Dilemma," Iowa State University (Blog) (July 13, 2017), *available at:* https://crops.extension.iastate.edu/blog/bob-hartzler/thoughts-dicamba-dilemma (last visited Sept. 5, 2017).

the application site. As dicamba is specifically engineered to combat broadleaf plants, any broadleaf vegetable crops—like potatoes, tomatoes, beans, peas, and squash—are particularly vulnerable to the herbicide. Such activities and events were known, expected, and/or otherwise reasonably foreseeable to Defendant.

16. And yet, faced with the choice between allowing invasive, glyphosate-resistant weeds to choke out crops, or apply dicamba to the Xtend crops they planted, many farmers took the foreseeable route of protecting their Xtend crops and applying dicamba over the top of Xtend crops prior to its approval. This activity was not only foreseeable to Defendant, but Defendant actively encouraged it.

17. Until November 9, 2016, Defendant had no regulatory approval from the EPA for its VaporGrip products, the "new dicamba" herbicide called XtendiMax with VaporGrip Technology, an allegedly lower-volatility formula than the "old dicamba." However, even after approval, the devastating effects of dicamba drift/volatilization from previous use continued to be observed through the 2017 growing season.

18. Throughout the affected states, departments of agriculture have been besieged with complaints from farmers concerning dicamba drift and resultant crop damage, leading some states to enact an outright ban on dicamba herbicides.

19. Defendant Monsanto's conduct here is consistent with its historical track record of disregarding the social, economic, and environmental consequences of its agricultural experiments. The premature release of the defective and incomplete Xtend crop system has, among other things, devastated Plaintiff and the Class'ss livelihood and destroyed their property, in total contravention of standard industry practice. Now,

Plaintiff Cow-Mil Farms brings this suit individually, and on behalf of all others similarly situated in the Class claiming, *inter alia*, Lanham Act violations, strict liability, negligence, trespass, and nuisance.

## JURISDICTION AND VENUE

20.    This Court has jurisdiction over this case under 28 U.S.C. § 1331 and 15 U.S.C. § 1121(a) in that claims are asserted under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

21.    This Court also has supplemental jurisdiction over this case under 28 U.S.C. § 1367(a).

22.    This Court has personal jurisdiction over the Defendant because it is a citizen of Missouri and this District, and it systematically and continuously conducts business within this District.

23.    Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(a) and (b), and Local Rule 3-2.07 because the Defendant is a resident of this District and Division.

## PARTIES

24.    Plaintiff Cow-Mil Farms, Inc. is a corporation engaged in row farming located in Senath, Dunklin County, Missouri. Its physical address is 204 North Jackson, Kennett, Missouri, 63857. The farm operates approximately 80 acres, alternating between cotton and soybean crops annually, and has been in operation for thirty years.

25.    As described more fully below, Plaintiff's crops were damaged by dicamba volatilization and drift. Monsanto was at fault for this damage for releasing two varieties

of genetically engineered (GE) seeds, Roundup Ready 2 Xtend soybeans and Bollgard II XtendFlex cotton seeds, before releasing the corresponding herbicide, leading to the illegal use of dicamba by surrounding farmers and inevitable and foreseeable drift to Plaintiff's crops. Monsanto violated industry practice and thus committed tortious and/or otherwise unlawful acts by its release of the seeds without a corresponding approved herbicide, or "a complete crop system." The crop system sold by Defendant is defective. It was reasonably foreseeable to Monsanto that farmers who purchased the Roundup Ready 2 Xtend soybeans and Bollgard II XtendFlex cotton seeds would instead spray a generic herbicide, dicamba, onto these seed crops as the corresponding herbicide was unavailable to them. It was reasonably foreseeable to Monsanto that in spraying dicamba, these farmers would ignore product warnings labels for the GE seeds and prohibitions under federal and state law. Dicamba had been shown to be prone to drift to surrounding properties, and thus such drift and resulting crop damage to neighboring crops of Class members, including Plaintiff, was reasonably foreseeable to Monsanto, making its conduct willful, reckless and/or negligent.

26.     Defendant Monsanto Company is a Delaware corporation, headquartered in St. Louis, Missouri. Defendant's principal place of business is at 800 N. Lindbergh Blvd., St. Louis, Missouri, 63167. Its registered agent is CSC of St. Louis County, Inc. located at 130 South Bemiston Avenue, Suite 700, Clayton, Missouri, 63105.

27.     Monsanto Co. is one of the largest agro-chemical and biotechnology companies in the world with annual sales exceeding $13 billion. See generally, https://monsanto.com/company/.

28.     Monsanto researched, developed, produced, distributed, and sold dicamba tolerant cotton and soybean seeds branded as Bollgard II XtendFlex and Roundup Ready 2 Xtend ("Xtend seeds") as part of the Xtend system, a dicamba resistant strain of seeds and counterpart herbicide, beginning as early as 2005.

## ALLEGATIONS COMMON TO ALL COUNTS

**A.     Dicamba Development**

29.     Dicamba was first registered as an herbicide in 1967.

30.     Historically, dicamba has been used very little in the American agricultural industry. According to data reported by Defendant, just 3.8 million pounds were applied to 25.3 million acres in 2011, representing only 0.9% of total agricultural herbicide use of 442 million pounds, and 6.5% of total cropland area of 390 million acres in 2012.

31.     Dicamba is not marketed by Monsanto, but has been manufactured and marketed by several other companies since 1967. Dicamba was not used often before 2015 because of its reputation among farmers that it is prone to drift to surrounding properties. The herbicide is toxic to all broadleaf plants that are not genetically engineered to withstand it. Historically, dicamba has been used before seeds were planted as a pre-season option, or during the "burndown" period. If applied during this period, dicamba is not as prone to volatilize and drift as it is when applied later in the season, after the crops begin to emerge, *i.e.* an over-the-top application.

32.     Dicamba works by increasing a plant's growth rate so the plant outgrows its nutrient supply and dies: "the plant literally grows itself to death."[4]

33.     Dicamba was primarily used in small doses, usually in a single application, in conjunction with other herbicides on wheat and corn crops, applied early in the growing season prior to emergence of many crops that would otherwise be damaged by dicamba (pre-plant application), and often when temperatures were much lower, decreasing the potential for volatilization.

34.     Interest in dicamba as an herbicide began to increase after broadleaf weed strains began to evolve a resistance to the popular Monsanto herbicide, *Roundup*, in the early 2000's.

35.     As early as 2005, Defendant tried to prolong the usefulness of its Roundup crop systems by reviving dicamba to combat the resistant weeds.

36.     Through genetic modification of seeds, Defendant created a strain of seeds that could resist injury from dicamba application where the invasive and noxious weeds could not. Defendant unveiled this technology in 2012, but assured its customers that the system would not be released without regulatory approval: "The Roundup Ready Xtend Crop System is…on track for Ground Breakers(SM) on-farm field trials under permit next season and introduction to U.S. soybean farmers in 2014, *pending regulatory approval*" (emphasis added).[5]

---

[4] Weise, E. "Monsanto in dispute with veggie farmers over herbicide," USA TODAY (Mar. 13, 2014), *available at:* https://www.usatoday.com/story/news/nation/2014/03/13/monsanto-dow-agrosciences-herbicides-save-our-crops/6015519/ (last visited Sept. 5, 2017).
[5] Monsanto Press Release (Nov. 28, 2012), *available at:* http://news.monsanto.com/press-

37.    In 2013, Monsanto began the marketing (and/or research and development) scheme, the "Follow-a-Field" initiative, which allowed potential consumers to track and view farm development and progress of three commercial-scale Xtend soybean fields.[6] At the time of the new initiative, dicamba was still unapproved for over-the-top application, yet the program emphasized the benefits of, and actively encouraged, the use of dicamba herbicide:

> These farmers will share their own experience with the system and application requirements, as well as show the advantages of incorporating dicamba into their weed control plans… site visitors can share in these experiences and gain knowledge of how diversified weed management practices that incorporate dicamba and glyphosate might fit into their own farming operations… The initiative will demonstrate the Roundup Ready Xtend™ Crop System application requirements… and the efficacy and crop safety of dicamba and glyphosate as an integral part of a diversified weed management program.

38.    During development of the Xtend system, Monsanto contracted with university researchers to measure the efficacy of newer dicamba formulations, but were prevented from measuring the volatility or "the potential of the herbicide to evaporate and settle on another farm, where it can damage crops, until the products were available for sale."[7] Monsanto explicitly denied requests by university researchers to study its dicamba-based herbicide for volatility testing, providing samples for testing with the

---

release/strong-harvest-results-demonstrate-monsanto-companys-position-industry-yield-leader-ch (last visited Sept. 5, 2017).

[6] Monsanto Press Release (August 27, 2013), *available at*:
http://news.monsanto.com/news/follow-field/monsanto-announces-follow-field-initiative-educate-growers-roundup-ready-2-xtend-s (announcing the "Follow-A-Field" marketing and/or research program in Minnesota for rolling out Xtend soybeans).

[7] Stecker, T. "Scientists Say They Were Left Out of Pesticide Drift Research," BLOOMBERG BNA (July 25, 2017), *available at:* https://www.bna.com/scientists-say-left-n73014462267/ (last visited Sept. 5, 2017).

strict caveat that researchers not conduct any volatility testing.[8] As Reuters reported in reference to the "weed killer crisis," this rejection was entirely contrary to standard industry practice: "Typically, when a company develops a new agricultural product, it commissions its own tests and shares the results and data with regulators. It also provides product samples to universities for additional scrutiny. Regulators and university researchers then work together to determine the safety of the product."[9]

39.     In January 2015, the U.S. Department of Agriculture approved the Xtend seeds for unrestricted commercial planting. At that time, and until the end of 2016, the only permissible agricultural application of dicamba was for use prior to planting and post-harvest; it was illegal to use any dicamba formulation in over-the-top application on cotton and soybeans.

## B.    Dicamba's Wide-Spread Destruction

40.     Despite having failed to obtain regulatory approval, Defendant began the distribution and sale of its Xtend cotton in a "limited" commercial introduction in the United States, in or around January 2015, with commercial launch of both Xtend cotton and soybeans beginning in early 2016.

41.     Through March 2016, Monsanto provided only a note that the entire system was pending regulatory approval for its component products, yet continued to advertise and sell the seeds as the "highest yield opportunity" and "the industry's first biotech

---

[8] Flitter, E. "Scant oversight, corporate secrecy preceded U.S. weed killer crisis," REUTERS (AUG. 9, 2017), *available at:*  http://www.reuters.com/article/us-usa-pesticides-dicamba-insight-idUSKBN1AP0DN (last visited Sept. 5, 2017).
[9] *Id.*

product with tolerance to both glyphosate and dicamba herbicides."[10] The marketing materials were updated by May, 2016 (presumably after seed purchase and even planting for many farmers) to limitedly disclaim that any information posted on its website relative to unregistered pesticides was educational only, and not a recommendation to use the unregistered product.[11]

42.    At all times relevant to this complaint, there was no existing or current dicamba product approved for in-crop use on Xtend soybeans or cotton. In fact, such a product was not approved until November 9, 2016, nearly two years after Defendant willfully, recklessly and negligently released its Xtend seeds into the market.

43.    Because VaporGrip (the dicamba herbicide) was not available for use with the Xtend crop system until November 9, 2016, it was reasonably foreseeable that farmers who grew Xtend seeds would be forced to choose between applying old dicamba on crops designed to resist dicamba and kill off super weeds or watching their Xtend crops fail. Monsanto itself classified the complete system (*i.e.*, the seeds and corresponding herbicide) as a *vital tool* in managing glyphosate-resistant weeds.[12]

44.    Nonetheless, Defendant pushed its Xtend seeds onto the market in the affected states with full knowledge that there was no corresponding herbicide available

---

[10] Archived  Website, Roundup Ready 2Xtend Soybeans, *available at*: http://web.archive.org/web/20160330042953/http://www.monsanto.com/products/pages/roundup-ready-2-xtend-soybeans.aspx (last visited Sept. 5, 2017).

[11] Archived  Website, Roundup Ready 2Xtend Soybeans, *available at*: http://web.archive.org/web/20160518033851/http://www.monsanto.com/products/pages/roundup-ready-2-xtend-soybeans.aspx (last visited Sept. 5, 2017).

[12] Monsanto Press Release (Feb. 3, 2016), *available at:* http://news.monsanto.com/press-release/products/farmers-gain-access-monsantos-roundup-ready-2-xtend-soybeans-2016 (last visited Sept. 5, 2017).

for in-crop use, contrary to standard industry practice.[13] Moreover, Monsanto released the seeds without first securing import approval form the European Union, compounding industry and farmer frustration, risking "price declines, confusion and disruption in international trade," [14] and further evincing the "profit at all costs" strategy typical of the company.

45.    To Monsanto, it was foreseeable that farmers would spray dicamba on a seed designed to resist it, that old dicamba is volatile and would drift, that the Xtend seeds would eventually dominate the market, and that the farming communities in the affected states (including Plaintiff and the Class) would suffer massive destruction to their crops.

46.    Monsanto never told farmers not to plant Xtend crops and never warned farmers, commercial applicators, state legislatures, or other interested third parties of the dangers of dicamba drift. Not surprisingly, Defendant also (either directly or through its agents) actively encouraged the illegal application of dicamba to Xtend crops.[15]

---

[13] Bennett, D., "Dicamba drift incidents have ripple effect," Delta Farm Press (Jul. 21, 2016), *available at:* http://www.deltafarmpress.com/soybeans/dicamba-drift-incidents-have-ripple-effect (last visited Sept. 5, 2017) ("we can't recall a technology like this being released without a corresponding herbicide.").

[14] *See, e.g.,* Meersman, T., "Minn. Farmers warned not to plant Monsanto's latest Roundup soybeans," Star Tribune (May 23, 2016), *available at:* http://www.startribune.com/monsanto-s-latest-roundup-soybean-seed-raising-eyebrows/380552371/ (last visited Sept. 5, 2017).

[15] *See, e.g.,* Stecker, T. "Scientists Say They Were Left Out of Pesticide Drift Research," BLOOMBERG BNA (July 25, 2017), *available at:* https://www.bna.com/scientists-say-left-n73014462267/  (last visited Sept. 5, 2017)  ("In 2015, a farmer who had purchased XTendFlex cotton testified that a seed representative told him to spray dicamba over his crops, even though it was illegal at that time") (citing *Smokey Alley Farm P'ship v. Monsanto Co.*, No. 4:17-cv-02031 (D.E. 1-10, at 10-12, 18) (July 19, 2017) (*In re Masters*, Arkansas Plant Board Hearing, July 8, 2016)) (n.7, *supra*).

47.    Monsanto marketed these seeds as high-yield crops to farmers facing high weed pressure and an ever-increasing resistance to traditional herbicides under the guise that EPA approval of dicamba herbicides was imminent. Farmers testified that if they had not been assured that the corresponding herbicide would be approved for over-top application well before the 2015 growing season, they would not have planted Xtend crops.[16]

48.    For example, a 2015 purchaser of Xtend cotton seeds testified before the Arkansas Plant Board that a Monsanto seed representative told him to spray dicamba over-the-top of his Xtend crops, even when it was illegal to do so.[17]

> MS. NICHOLS: The Committee asked that you come in or required that he come in. I think they have some questions as to why they considered this a grievous and they wanted to know -- from what I understand, why this application was made at this rate.
>
> MR. HOWE: Exactly right.
>
> MR. MASTERS: Well, you think I just grabbed it out of the air? You think the boy that just left here just grabbed those figures out of the air and did it. Somebody told him to, right?
>
> MR. FINCH: Who told you to?
>
> MR. MASTERS: You know who did. I'm not going to say it.
>
> MR. FINCH: Monsanto?
>
> MR. MASTERS: A few words may incriminate myself. Why sure.

---

[16] *Id.*
[17] *Id.*

MR. FINCH: So, Monsanto told you to spray this Strut –

MR. MASTERS: Well --

MR. FINCH: -- directly over the top and it wouldn't hurt a thing?

MR. MASTERS: Right. And the cotton is developed and it didn't hurt the cotton one dab, but they told us it would be legal, but you know it's not legal. Now, this is January of '15 that it's not legal right now, but it will be by May at the latest. So, we planted it, we sprayed it, then everybody commenced to saying, "Oh, it's not legal no more. It's not legal." Well, it -- I'm just like the rest of you. I didn't read the writing. Dicamba, I've used it on corn. Clarity, which is a more refined Dicamba that's some of the other. There's two formulations of Dicamba. One, the salts in them are a little different. And I can't remember exactly what they were, but Clarity is the one that's a little more better to spray over cotton than the other cheaper variety is.

MR. FINCH: But who's your rep?

MR. MASTERS: I'm not going to say, because he was just doing what somebody told him.
***
MR. FINCH: Would you have planted this – would you have bought this cotton had you known that Montsanto [sic] would come in or EPA might come in and destroy that crop because you did an off label application? Would you have planted that crop?

MR. MASTERS: No. And I wouldn't have planted that crop if they hadn't told me that it would probably be -- in other words, they pretty well assured me that in '15, that before May, that it would be legal. You could spray over the top of it and be just fine.

49.     Thus, during the 2015 and 2016 growing seasons in the affected states, farmers improperly used and illegally sprayed older, highly volatile, versions of dicamba over the top of Xtend crops.

50.     Farmers such as Plaintiff who were not growing Xtend crops had no way to protect themselves from farmers who were spraying old dicamba herbicides on their new Xtend crops. But for Defendant's tortious actions, these harms would not have occurred.

51.     Defendant's marketing and advertising materials for its Xtend products influenced and induced farmers in the affected states to purchase Xtend seeds. The only warnings Monsanto provided farmers with concerned the consequences to farmers/applicators themselves, a virtually nominal fine. Monsanto did not explain that *any* over-the-top application of unapproved dicamba formulas would lead to drift and damage to non-target crops and plants.

52.     Complaints of dicamba drift are snowballing in the wake of VaporGrip approval. A University of Missouri plant scientist professor stated that such complaints were "concerning but not a surprise" and that "continued damage from the herbicide this year would be a predictable consequence of so many farmers converting to dicamba-tolerant soybeans and cotton — many of whom did so to avoid the damage suffered last

year."[18] Indeed, Monsanto has created a veritable "treadmill" trapping farmers in Monsanto's "herbicide arms race."[19]

53.    Another explanation for the sharp uptick in dicamba-related complaints can be attributed to the lack of independent volatility testing on the new dicamba formulations, which occurred only *after* the dicamba products were on the market.[20]

54.    The motive for this rush to promote the Xtend seeds is no mystery; Monsanto sought to profit off the new technology as early as possible and corner the market on dicamba-resistant seeds. Indeed, Monsanto has seen a nine percent increase in net sales according to its 10-Q filing for the third quarter of 2017, attributing this increase primarily to the Xtend cotton and soybean seed "penetration" in the United States, and first-time XtendiMax with VaporGrip technology dicamba-based herbicide revenues.[21]

---

[18] Gray, B., "Dicamba damage is back – and possibly worse than before." ST. LOUIS POST-DISPATCH (June 25, 2017), *available at*: http://www.stltoday.com/business/local/dicamba-damage-is-back-and-possibly-worse-than-before/article_2e33ec05-ae98-5468-92f8-bccf6bcd7698.html (last visited Sept. 5, 2017).

[19] Faber, S., "Trapped on Monsanto's Chemical Treadmill: Dicamba Debacle Shows Folly of Herbicide Arms Race," AgMag (Aug. 30, 2017), *available at:* http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&cad=rja&uact=8&ved=0ahUKEwif6cGtr5PWAhVC7mMKHWukBpEQFggrMAA&url=http%3A%2F%2Fwww.ewg.org%2Fagmag%2F2017%2F08%2Ftrapped-monsanto-s-chemical-treadmill-dicamba-debacle-shows-folly-herbicide-arms-race&usg=AFQjCNH9C7iyFn8FuTXsQE2fHxnjSsT5iQ (last visited Sept. 5, 2017) (quoting Dewey, C., "This miracle weed killer was supposed to save farms. Instead, it's devastating them," WASH. POST (Aug. 29, 2017), *available at:* https://www.washingtonpost.com/business/economy/this-miracle-weed-killer-was-supposed-to-save-farms-instead-its-devastating-them/2017/08/29/33a21a56-88e3-11e7-961d-2f373b3977ee_story.html?hpid=hp_hp-more-top-stories_dicamba-626pm%3Ahomepage%2Fstor&utm_term=.86e3383fcb07).

[20] *See, e.g.*, Stecker, T., "Scientists Say They Were Left Out of Pesticide Drift Research," BLOOMBERG BNA (July 25, 2017), *available at:* https://www.bna.com/scientists-say-left-n73014462267/ (last visited Sept. 5, 2017) (n.7, *supra*).

[21] Monsanto 10-Q SEC Filing, p. 38 (June 28, 2017), *available at*: https://otp.investis.com/clients/us/monsanto/SEC/sec-

According to Monsanto's executive vice president and chief technology officer, Robb Fraley, the Xtend technology is being adopted in record numbers.[22]

55.    As of September 7, 2017, at least six lawsuits have been filed related to dicamba damage and the Xtend system, and 17 states have launched formal investigations after being flooded by complaints reporting more than 3.1 million acres of soybeans alone that have potentially been damaged as a result (*see* Fig. 3).[23]

---

show.aspx?Type=html&FilingId=12151565&CIK=0001110783&Index=10000 (last visited Sept. 5, 2017).

[22] Gray, B., "Dicamba damage is back – and possibly worse than before." St. Louis Post-Dispatch (June 25, 2017), *available at:* http://www.stltoday.com/business/local/dicamba-damage-is-back-and-possibly-worse-than-before/article_2e33ec05-ae98-5468-92f8-bccf6bcd7698.html (last visited Sept. 5, 2017) (n.18, *supra*).

[23] Flitter, E. "U.S. environment regulator reviews pesticide after damage report," REUTERS (Aug. 1, 2017), *available at:* https://www.reuters.com/article/us-usa-pesticides-epa-idUSKBN1AH585; Missouri Integrated Pest Management, "Update on Dicamba-related Injury Investigations and Estimates of Injured Soybean Acreage," University of Missouri (Aug. 14, 2017), *available at:* https://ipm.missouri.edu/IPCM/2017/8/Update-on-Dicamba-related-Injury-Investigations-and-Estimates-of-Injured-Soybean-Acreage/ (last visited Sept. 5, 2017).



**Fig. 3** "Estimates of dicamba-injured soybean acreage as reported by state extension weed scientists (as of August 10, 2017)."

56.     The impact of dicamba drift is not limited to property destruction; it has taken an emotional toll on farming communities as well. In a somewhat prophetic article from March, 2014, *USA Today* reported that famers feared the introduction of dicamba-tolerant seeds would not only destroy crops, but damage the fabric of farming communities by enabling a corporation to pit neighbor against neighbor, and farmer against farmer.[24] In June 2017, NPR captured the moment this fear came to fruition, when one farmer's use of the dicamba herbicide damaged another's fields, leading to the

---

[24] Weise, E. "Monsanto in dispute with veggie farmers over herbicide," USA Today (Mar. 13, 2014), *available at:* https://www.usatoday.com/story/news/nation/2014/03/13/monsanto-dow-agrosciences-herbicides-save-our-crops/6015519/ (last visited Sept. 5, 2017) (n.4, *supra*).

fatal shooting of an Arkansas cotton and soybean farmer.[25] This devastation continues unabated.

## C.    Defendant's Intent and Fraudulent Concealment

57.    Defendant knowingly and intentionally committed the acts, concealments and material omissions alleged herein.

58.    All actions and omissions by Defendant were willful and not the result of mistake or inadvertence.  At all times relevant, Defendant was aware of the defective nature of its Xtend system.  Despite this, Defendant manufactured, marketed, and sold its incomplete Xtend system as fit for its intended purpose.  Defendant knowingly and intentionally directed its agents and representatives undertake the illicit practices and conceal the material facts that are the subject of this suit.  Defendant's acts were motivated by a desire to maximize sales and to corner the dicamba-resistant seed market, as opposed to placing the welfare of Plaintiff and Class members first.

59.    Defendant knowingly advertised, marketed, and sold the incomplete and defective Xtend system knowing that it was defectively designed, lacked the corollary herbicide, would result in off-label application of dicamba herbicides that were prone to volatilize and drift, and would result in the wide-spread destruction of non-tolerant plants in the vicinity.  Further, at all times extending through the Class Period, Defendant knew

---

[25] Mccune, M., "A Pesticide, A Pigweed and a Farmer's Murder," NPR Morning Edition (June 14, 2017), *available at:* http://www.npr.org/2017/06/14/532879755/a-pesticide-a-pigweed-and-a-farmers-murder (last visited Sept. 5, 2017); Gray, B., "Bootheel Man Arrested Following Fatal Shooting Allegedly Sparked by Dicamba Dispute," ST. LOUIS POST-DISPATCH (Oct. 28, 2016), *available at:* http://www.stltoday.com/news/local/crime-and-courts/bootheel-man-arrested-following-fatal-shooting-allegedly-sparked-by-dicamba/article_2ecdcd7f-f2b3-5e3b-ab09-43dbe1e06e49.html (last visited Sept. 5, 2017).

that the design defects and safety hazards in its Xtend system could be totally eliminated by: (1) withholding Xtend seeds until the corresponding herbicide had been vetted and approved, and (2) allowing the volatility research requested by universities prior to commercialization, consistent with standard industry practice.

60.     Notwithstanding Defendant's knowledge of the design defects and inherent safety risks in its Xtend system, and its knowledge of safer alternatives to releasing the incomplete Xtend system (the seeds) prior to appropriate testing and regulatory approval, Defendant engaged in a continuous pattern of concealment and suppression of material facts, and affirmative misrepresentations regarding the character of the Xtend system, the timing of the herbicide approval and release, and subsequent to approval and release, the volatility of the approved dicamba formulations. Rather than provide farmers with complete and accurate information based on its exclusive and superior knowledge, Defendant engaged in a continuing and consistent pattern and practice of deception and concealment, up to and through the Class Period, to mislead farmers into believing Defendant's products were defect-free and safe to use.  As a result, consumers and third-parties had no knowledge of the true nature and extent of the safety risks involved in continuing to purchase and plant Xtend seeds.

61.     Defendant had a duty to disclose these material facts to Plaintiff, the Class, and its consumers, and to prevent injury to Plaintiff and the Class caused by its products. *See generally*, *Landers v. Monsanto Co.*, No. 1:17-cv-00020 (D.E. 20) (Aug. 17, 2017) (Order Denying in Part Motion to Dismiss) (finding special circumstances in Monsanto's

commercialization of the Xtend system such that Defendant's owed Plaintiff a duty of care).

**D. Defendant's Conduct Was the Proximate Cause of Plaintiff's Injury and Damage**

62.    Co-Mil Farms usually averages 40-50 bushels of soybeans per acre, with an annual gross income totaling around $40,000.00.

63.    During the 2016 growing season, Cow-Mil Farms saw a reduction of approximately 40% in its soybean production due to neighboring farmers using dicamba, which equated to at least $16,000.00 of damages across 80 acres.

## CLASS ALLEGATIONS

64.    Pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of itself and as the "Class" defined as:

> All agricultural farmers, agricultural farming operations, and landowners who raise non-dicamba-tolerant vegetation and suffered damage to that vegetation from dicamba that was applied to Defendant's Xtend seeds during the relevant Class Period.

65. The State Subclasses is defined as:

> All agricultural farmers, agricultural farming operations, and landowners in Missouri who raise non-dicamba-tolerant vegetation and suffered damage to that vegetation from dicamba that was applied to Defendant's Xtend seeds during the relevant Class Period.

66.    The "Class Period" for the Class dates back to the length of the longest applicable statute of limitations for any claims asserted on behalf of that Class from the date this action was commenced and continues through the present and the date of judgment.

67.    Excluded from the Class is Defendant, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; the undersigned counsel for Plaintiff and its employees; and the judge and court staff to whom this case is assigned. Also excluded from the Class and subclass are farmers who purchased or planted Xtend products. Plaintiff reserves the right to amend the definition of the Class and Class Period if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

68.    All requirements for class certification in Fed. R. Civ. P. 23(a) and 23(b)(3) are satisfied with respect to the class. Alternatively, class certification under Fed. R. Civ. P. 23(b)(1) and/or 23(b)(2) is proper.

69.    *Numerosity of the Class*: The Class is so numerous that the individual joinder of all members is impractical under the circumstances of this case. Based on the number of farmers and farms who have made pesticide drift complaints to state departments of agriculture and the EPA, there are thousands of farmers and farms who have been damaged by dicamba in the affected states. Upon information and belief, there are hundreds of other farmers who did not make drift pesticide complaints to their state agencies and yet suffered crop damage from dicamba in the affected states.

70.    *Ascertainable Class*: The community of interest among these class members in the litigation is well defined and the proposed classes are ascertainable from objective criteria. If necessary to preserve the case as a class action, the court itself can redefine the Class and/or create additional sub-classes.

71.   ***Commonality***: Common questions of law and fact exist as to all members of the Class and predominate over any questions that affect only individual members of the Class. All Plaintiffs suffered damage to their crops from dicamba drift, dicamba volatilization, and dicamba spraying when dicamba was applied to Defendant's Xtend crops by farmers and applicators. All Plaintiffs grow non-dicamba-tolerant crops or crops vulnerable to dicamba herbicides. All Plaintiffs suffered crop damage and diminished crop yields due to dicamba. All Plaintiffs suffered financial injury to their farms and their livelihoods due to dicamba. The common questions of law and fact include, but are not limited to:

a)  Whether Plaintiff suffered crop damage from dicamba due to the illegal spraying of dicamba on Defendant's Xtend seeds;

b)  Whether Plaintiff suffered crop damage from dicamba drift and volatilization when farmers and applicators applied dicamba to Defendant's Xtend seeds;

c)  Whether, in 2015 and 2016 and up until trial or resolution of this matter, Defendant released its Xtend seeds in a defective condition, unreasonably dangerous when put to their reasonably anticipated use because no safe herbicide was marketed by Defendant or any other company;

d)  Whether the Xtend seeds were defective due to the lack of any safe herbicide;

e)  Whether Defendant knew its Xtend seeds were defective and knew that farmers who grew Xtend crops would spray dicamba on a seed designed to resist it;

f)  Whether Xtend seed purchasers and third parties had knowledge of the defective condition of the seeds because no safe herbicide was marketed by Defendant or any other company;

g)  Whether Defendant gave an adequate warning to purchasers and third parties of the danger of the Xtend seeds;

h) Whether Defendant negligently designed and marketed its Xtend cotton and soybean seeds;

i) Whether Defendant failed to use ordinary care by neglecting to provide an adequate warning of the danger of its Xtend crops;

j) Whether Defendant had a legal duty to innocent third parties, including Plaintiff, to use ordinary care to protect them against the unreasonable risk of harm of the inevitable illegal spraying that would occur to protect crops grown from Xtend seeds; and

k) Whether Defendant suppressed or concealed material facts about the safety of its Xtend crop system, its risks to third parties, including Plaintiff, such that Defendant created a situation where illegal spraying was not only likely but inevitable, and that Defendant was well-aware of the catastrophic damages that would occur to third parties as a result of this inevitable illegal spraying.

72.    Individual questions are minimal. For example, some members of the Class may not grow the same crops as other members of the Class or may farm more or less acreage than other members of the Class, yet the source and the cause of their damages are the same. To the extent Plaintiff's damages differ, that can be resolved through individual damage criteria, the creation of subclasses, or an abbreviated procedure for processing individual claims.

73.    All Plaintiffs suffered the same type of damage from Defendant's defective crop system and seeds. All Plaintiffs also suffered the same type of harm and were damaged from the same course of conduct by Defendant.

74.    *Typicality*: Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and the members of the Class raised non-dicamba-tolerant crops, not targeted by dicamba herbicide, and those crops were damaged by dicamba herbicides applied to Defendant's Xtend seeds by other farmers and applicators in the U.S.

75.     *Adequacy*: Plaintiff and the undersigned counsel will fairly and adequately protect the interests of members of the Class. Plaintiff has no interests that are adverse to the interests of the other members of the Class and has hired counsel experienced in class actions, complex litigation, and trial practice.

76.     *Superiority*: A class action is superior to other available means for the fair and efficient adjudication of this controversy. Because individual joinder of all members of the Class is impractical, class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of effort and expense that numerous individual actions would engender. The expenses and burdens of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them, while important public interests will be served by addressing the matter as a class action. The cost and burden on the court system of adjudication of individualized litigation would be substantial, and significantly more than the costs and burdens of a class action. Class litigation would also prevent the potential for inconsistent or contradictory judgments.

77.     *Predominance/Community of Interest*. The proposed Class has a well-defined community of interest in the questions of fact and law to be litigated. The common questions of law and fact predominate with respect to the liability issues, relief issues and anticipated affirmative defenses. The named Plaintiff has claims typical of the Class. Without limitation, as a result of Defendants' conduct alleged herein, Plaintiff was:

(a) injured; and (b) sustained pecuniary loss in an ascertainable amount to be proven at the time of trial.

78.     In the alternative, the above-defined Class may be certified pursuant to Fed. R. Civ. P. 23(b)(1) and (b)(2) because:

a) The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members' claims which would establish incompatible standards of conduct for Defendant;

b) The prosecution of separate actions by individual members of the Class would create a risk of adjudications which would as a practical matter be dispositive of the interests of other members of the Class who are not parties to the adjudications, or which would substantially impair or impede the ability of other class members to protect their interests; and

c) Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class.

## CAUSES OF ACTION

### COUNT I
### Lanham Act

79.     Plaintiff incorporates by reference all of the above-stated paragraphs as though fully set forth herein.

80.     The Lanham Act, 15 U.S.C. § 1125(a), entitled "False designation of origin, false descriptions, and dilution forbidden," provides in pertinent part:

a.  Civil action

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false

designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

81.    Monsanto has used or continues to use in commerce false or misleading descriptions of fact, false or misleading representations of fact, and/or omissions of material fact which it had a duty to disclose which misrepresented directly and/or by omission, and were likely to cause and/or did cause confusion and mistake, or to deceive, regarding Xtend seeds, the timing of the dicamba herbicide approval by the EPA, and the Xtend system's impact agricultural crops in the U.S.

82.    Monsanto's representations, statements, and commentary have included, but are not limited to:

a) Monsanto's statements to farmers and prospective customers in its marketing materials (*e.g.*, on its websites and in its advertising literature) that its Xtend products would not be released until EPA approval;

b) The numerous statements to the press made concerning "imminent" EPA approval;

c) Other statements indicating that approval from of over-the-to application of dicamba on its Xtend products was expected at times when Monsanto knew it was not;

d) Sales representatives informing applicators and farmers they were allowed to and/or should spray dicamba over-the-top of their Xtend crops in 2015 and 2016; and

e) Omissions of material fact regarding the foreseeable consequences and damage from use of the crop system due to volatilization and drift.

83.    Further, Defendant's statements and commentary made to the press, statements on the internet, incorporated into Defendant's websites, product labels and marketing materials, which, *inter alia*, represent that dicamba could be safely used for over-the-top application on Xtend products and would not lead to drift and volatilization were materially false statements that were likely to cause confusion and mistake as to the nature, characteristics, and qualities of Xtend seeds and Defendant's over-the-top dicamba formulations used thereon.

84.    Each as more fully alleged above, are materially false statements that misrepresented and are likely to cause confusion and mistake as to the nature, characteristics, and qualities of the Xtend system, the timing of the dicamba herbicide approval by the EPA, and the impact on agricultural crops in the U.S.

85.    These statements were made in commercial advertising and promotion for Xtend products and the Xtend system.

86.    Monsanto had economic motivation for making such statements and omissions, because as a result of the rampant and wide-spread damage caused by the false and misleading advertising and marketing of the Xtend system, farmers have lost

the ability to choose the seeds planted, including whether they are GM crops at all, and have resorted to Xtend seeds out of necessity.

87.    The record sales described herein demonstrate that Monsanto's misrepresentations, omissions, and statements are and/or were material.

88.    Monsanto's direct statements and/or omissions of material fact were likely to influence purchasing decisions of farmers.

89.    Monsanto's statements were widely distributed.

90.    Monsanto's products travel or traveled in interstate commerce.

91.    Plaintiff and members of the Class have and continue to be damaged by Monsanto's material misrepresentations. Plaintiff and members of the Class were injured and/or continue to suffer injury to their property, including destruction and injury to the crops that they grow. This property damage and related economic injury are likely to continue in the future.

92.    Plaintiff's and members of the Class's damages were proximately caused by Monsanto's misleading representations as described herein. Indeed, Monsanto directly or through its agents, not only foresaw illicit application of dicamba, but actively encouraged it.

93.    Monsanto's representations, statements, and commentary as more fully set forth herein were made with knowledge or reckless disregard of their falsity and the resulting risk and damage to the Plaintiff, members of the Class, and the public at large.

94.    Monsanto's acts constitute the use of false descriptions and false representations in interstate commerce in violation of § 1125(a) of the Lanham Act and

entitle Plaintiff, individually and on behalf of the other Class members, to recover damages, the costs of this action, and, because this case is exceptional, reasonable attorneys' fees.

## COUNT II
## Public Nuisance

95.     Plaintiff incorporates by reference all of the above-stated paragraphs as though fully set forth herein.

96.     At all times relevant herein, Monsanto was in control of the Xtend system. Monsanto was subject to federal and state regulations concerning the formulation, release, and commercialization of the Xtend system including the Xtend seeds and dicamba herbicide. Rather than releasing Xtend as a complete system, Monsanto intentionally and willfully released the Xtend seeds without corresponding herbicide which was pending approval by the EPA. Monsanto was aware of, and actively encouraged, the illicit use of dicamba to protect Xtend crops, falsely representing EPA approval of dicamba herbicides was unnecessary and/or imminent.

97.     Through the conduct alleged above, Monsanto has created a public nuisance by causing widespread destruction of non-Xtend crops and vegetation by its premature and incomplete release of the Xtend system.

98.     This unreasonable interference is imposed on the community at large and on a considerable diverse number of persons and entities. It arises from Monsanto's testing, growing, storing, transporting, selling, disposing, and otherwise disseminating Xtend seeds: (a) without an adequate herbicide legally available to protect the growth of

Xtend seeds; (b) with knowledge that farmers would resort to using any available dicamba based herbicide to protect their Xtend crops; and (c) with knowledge that the available dicamba herbicide was highly volatile and susceptible to drift, such that any non-Xtend vegetation in reasonable proximity to the applied herbicide would be destroyed.

99.    Monsanto has unreasonably interfered with the public's right to enjoyment of dicamba-free crops and surrounding vegetation. Not only has the herbicide destroyed crops and vegetation, it has interfered with the public's ability to choose non-Xtend seeds for crops and agricultural products in the market, as dicamba drift has destroyed non-Xtend crops.

100.   This interference is unreasonable in that it involves a significant interference with public health, safety, peace, comfort, and/or convenience. It is also unreasonable in that it is proscribed by law, is of a continuing nature, and has produced a permanent or long-lasting effect.

101.   Plaintiff and members of the Class have suffered harm caused by Monsanto's public nuisance distinct from, and different than, that suffered by the general public as described above. Plaintiff's and the Class's damages include, but are not limited to, destruction of their crops, lost profits from the destruction of their crops, and a dependence on the Xtend system to prevent, mitigate, and/or offset harm from future drift of the dicamba.

102.    This constitutes an unreasonable and substantial interference with rights common to the general public in that it has restricted variety and availability of non-Xtend crops, and destroyed crops and vegetation throughout the United States.

103.    Monsanto knew or should have known that its conduct would naturally or probably result in injuries and damages to Plaintiff, the Class, and the general public. Nevertheless, Monsanto continued such conduct in reckless disregard of or conscious indifference to those consequences.

104.    As a direct and proximate result of the foregoing, Plaintiff, the Class, and the public at large have been injured and suffered financial loss for which damages, injunctive relief, declaratory, and other relief as may be available at law or equity are warranted.

## COUNT III
## Private Nuisance

105.    Plaintiff incorporates by reference all of the above-stated paragraphs as though fully set forth herein.

106.    At all times relevant herein, Monsanto was in control of the Xtend system. Monsanto was subject to federal and state regulations concerning the formulation, release, and commercialization of the Xtend system including the Xtend seeds and dicamba herbicide. Rather than releasing Xtend as a complete system, Monsanto intentionally and willfully released the Xtend seeds without corresponding herbicide which was pending approval by the EPA. Monsanto was aware of, and actively

encouraged, the illicit use of dicamba to protect Xtend crops, falsely representing EPA approval of dicamba herbicides was unnecessary and/or imminent.

107.   This unreasonable interference arises from Monsanto's testing, growing, storing, transporting, selling, disposing, and otherwise disseminating Xtend seeds: (a) without an adequate herbicide legally available to protect the growth of Xtend seeds; (b) with knowledge that farmers would resort to using any available dicamba based herbicide to protect their Xtend crops; and (c) with knowledge that the available dicamba herbicide was highly volatile and susceptible to drift, such that any non-Xtend vegetation in reasonable proximity to the applied herbicide would be destroyed.

108.   Through the conduct alleged above, Monsanto has created a private nuisance by substantially and unreasonably interfering with Plaintiff's and members of the Class's quiet use and enjoyment of their land and/or property interests.

109.   This interference is unreasonable in that it involves Plaintiff's and members of the Class's right to enjoyment of dicamba-free crops and ability to plant non-Xtend seeds in the future. It is also unreasonable in that it is proscribed by law, is of a continuing nature, and has produced a permanent or long-lasting effect.

110.   Plaintiff and members of the Class had no ability to control the nuisance themselves.

111.   Plaintiff and the Class's damages include, but are not limited to, destruction of their crops, lost profits, and a dependence on the Xtend system to prevent, mitigate, and/or offset harm from future drift of the dicamba.

112.    Monsanto knew or should have known that its conduct would naturally or probably result in injuries and damages to Plaintiff, the Class, and the general public. Nevertheless, Monsanto continued such conduct in reckless disregard of or conscious indifference to those consequences.

113.    As a direct and proximate result of the foregoing, Plaintiff and the Class have been injured and suffered financial loss for which damages, injunctive relief, declaratory and other relief as may be available at law or equity are warranted.

114.    Monsanto acted consciously or deliberately with oppression, fraud, wantonness, and malice. Monsanto acted, and failed to act, with a conscious disregard for the rights and safety of others including Plaintiff and members of the Class such that punitive damages are warranted.

### COUNT IV
### Trespass to Chattels

115.    Plaintiff incorporates by reference all of the above-stated paragraphs as though fully set forth herein.

116.    At all times relevant herein, Monsanto was in control of the Xtend system. Monsanto was subject to federal and state regulations concerning the formulation, release, and commercialization of the Xtend system including the Xtend seeds and dicamba herbicide. Rather than releasing Xtend as a complete system, Monsanto intentionally and willfully released the Xtend seeds without corresponding herbicide which was pending approval by the EPA. Monsanto was aware of, and actively

encouraged, the illicit use of dicamba to protect Xtend crops, falsely representing EPA approval of dicamba herbicides was unnecessary and/or imminent.

117.   Plaintiff and members of the Class are farmers engaged in the planting, cultivation, harvesting, and selling of crops.

118.   Defendant has physically diminished, damaged, and/or killed Plaintiff's and members of the Class's crops by the premature commercialization of Xtend seeds.

119.   Defendant had knowledge to a substantial certainty that drift would occur on non-target crops, including those of Plaintiff and members of Class, which was a foreseeable result of premature commercialization of Xtend seeds and the proximate cause of Plaintiff's and members of the Class's damages.

120.   Plaintiff's and members of the Class's damages are ongoing as a result of the continued and wide-spread use of dicamba required to sustain Xtend crops which many farmers necessarily turned to planting after initial devastation by dicamba from the illicit application prior to regulatory approval.

### COUNT V
### Strict Liability
### Design Defect

121.   Plaintiff incorporates by reference all of the above-stated paragraphs as though fully set forth herein.

122.   Monsanto designed, tested, developed, manufactured, marketed, distributed, and sold Xtend seeds in the course of its ordinary business.

123.   As described above, Xtend seeds were in a defective condition, unreasonably dangerous when put to their reasonably anticipated use because no safe

herbicide was marketed by Monsanto or any other company. Thus, the Xtend products were defective due to the lack of any safe herbicide, and should not have been sold.

124.    Xtend seeds were planted by farmers, their reasonably anticipated use.

125.    Plaintiff and members of the Class were damaged as a direct result of the defective condition which existed when the product was sold.

126.    At all times, Monsanto sold its Xtend cotton and soybean seeds and knew of the defective condition and danger of its Xtend cotton and soybean seeds.

127.    The actions of Monsanto and the injuries inflicted against Plaintiff and the Class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiff and the Class to a recovery of punitive damages against Monsanto in a fair and reasonable amount.

**COUNT VI**
**Strict Liability**
**Failure to Warn**

128.    Plaintiff incorporates by reference all of the above-stated paragraphs as though fully set forth herein.

129.    Monsanto sold Xtend cotton and soybean seeds in the course of its ordinary business.

130.    As described above, Xtend seeds were unreasonably dangerous at the time of sale. The Xtend seeds were unreasonably dangerous when put to their reasonably anticipated use without knowledge of purchasers and third parties of their defective condition because no safe herbicide was marketed by Monsanto or any other company.

131.    Monsanto did not give an adequate warning to purchasers or third parties of the danger of Xtend crops.

132.    Xtend seeds were planted by farmers, their reasonably anticipated use.

133.    Plaintiff and members of the Class were damaged as a direct result of the Xtend cotton and soybean seeds being sold without an adequate warning.

134.    At all times, Monsanto sold its Xtend cotton and soybean seeds and knew of the danger of its Xtend cotton and soybean seeds.

135.    The actions of Monsanto and the injuries inflicted against Plaintiff and the Class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiff and the Class to a recovery of punitive damages against Monsanto in a fair and reasonable amount.

## COUNT VII
### Negligence

136.    Plaintiff incorporates by reference all of the above-stated paragraphs as though fully set forth herein.

137.    The law reasonably imposes a duty on a manufacturer to exercise reasonable care not to commercialize and sell its product in a way that creates a risk of widespread harm resulting from the intended use of the product by all its customers.

138.    Monsanto had superior knowledge that the Xtend seeds were unreasonably dangerous when put to their reasonably anticipated use because purchasers and third

parties were unaware of the defective condition created by Monsanto's failure to market a safe herbicide, effectively releasing a product inviting use of a dangerous herbicide.

139.    Monsanto owed a duty to farmers, including Plaintiff and members of the Class, to exercise reasonable care in the design, timing, scope, and terms under which it commercialized Xtend seeds.

140.    Monsanto breach its duty by acts and omissions including but not limited to:

   a. Prematurely commercializing Xtend seeds on a widespread basis without a corresponding herbicide to complete the Xtend system;

   b. Failing to use ordinary care in the design, promotion, advertising, and marketing of the Xtend seeds as products to be used with dicamba, because there was no safe herbicide on the market, and no company exercising ordinary care would have designed or marketed such a product;

   c. Failing to adequately warn farmers of the necessity of dicamba in growing Xtend crops and the dangers associated with illicit application of dicamba to such crops;

   d. Selling Xtend seeds to farmers with knowledge that the farmers lacked mechanisms or ability to effectively grow crops without dicamba herbicides;

   e. Continuing to sell Xtend seeds with knowledge that there was a significant risk that farmers and applicators would use illegal herbicides to protect their crops; and

   f. Allowing/encouraging representatives to instruct third parties to apply dicamba herbicide in contravention of warning labels and state and federal regulations.

141.    Monsanto's negligence directly and proximately caused harm to Plaintiff and members of the Class.

142.    Monsanto acted consciously or deliberately with oppression, fraud, wantonness, and malice. Monsanto acted and failed to act, with a conscious disregard for the rights and safety of others including Plaintiff and members of the Class such that punitive damages are warranted.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, pray and respectfully request relief as follows:

A.    Entry of judgment ordering Monsanto to take affirmative steps to remediate the contamination and destruction it has caused;

B.    Certification of the Class and Subclass as defined herein pursuant to Fed. R. Civ. P. 23(a) and 23(b)(1), (b)(2), (b)(3), or a combination of subsections;

C.    Appointment of Plaintiff as Class Representative and the undersigned counsel as Class counsel;

D.    Award Plaintiff and the members of the Class monetary damages including compensatory relief, punitive damages, and actual damages in an amount to be determined at trial;

E.    Appropriate preliminary and permanent injunctive and declaratory relief;

F.    Statutory damages and penalties as provided by law;

G.    Prejudgment interest commencing on the date of payment of the charges and continuing through the date of entry of judgment in this action;

H.    Costs and fees incurred in connection with this action, including attorneys' fees, expert witness fees, and other costs, as provided by law; and

I.      Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated: September 8, 2017              SOWERS & WOLF ATTORNEYS AT LAW

By:  */s/ Eric Sowers*
Eric Sowers, MO Bar No. 24970
es@sowerswolf.com
Ferne P. Wolf, MO Bar No. 29326
fw@sowerswolf.com
Joshua M. Pierson, MO Bar No. 65105
jp@sowerswolf.com
530 Maryville Centre Drive, Suite 460
Saint Louis, Missouri 63141
Tel: (314) 744-4010
Fax: (314) 744-4026

Hart L. Robinovitch
Hart.Robinovitch@zimmreed.com
ZIMMERMAN REED LLP
14646 N. Kierland Blvd., Suite 145
Scottsdale, Arizona  85254
Tel: (480) 348-6400
Fax: (480) 348-6415

Charles S. Zimmerman
Charles.Zimmerman@zimmreed.com
Alyssa J. Leary
Alyssa.Leary@zimmreed.com
ZIMMERMAN REED LLP
1100 IDS Center
80 South 8th Street
Minneapolis, Minnesota 55402
Tel:  (612) 341-0400
Fax:  (612) 341-0844

J. Bruce McMath
Bruce@mcmathlaw.com
Will Bond
Will@mcmathlaw.com
Samuel E. Ledbetter
Sam@mcmathlaw.com
MCMATH WOODS P.A.
711 W. Third Street
Little Rock, Arkansas 72201
Tel: (501) 396-5412
Fax: (501) 374-5118

*Attorneys for Plaintiff and the Class*